Cite as 2020 Ark. App. 323

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-20-84

<table>
<tr><td>BARBARA DOUCET<br><br>               APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br><br>               APPELLEES</td><td>**Opinion Delivered:** June 3, 2020<br><br>APPEAL FROM THE WASHINGTON<br>COUNTY CIRCUIT COURT<br>[NO. 72JV-18-311]<br><br><br>HONORABLE STACEY<br>ZIMMERMAN, JUDGE<br><br>AFFIRMED</td></tr>
</table>

### RITA W. GRUBER, Chief Judge

Appellant Barbara Doucet appeals from an order of the Washington County Circuit Court terminating her rights to her minor children. On appeal, Barbara argues that there was insufficient evidence that termination was in the children's best interest. We affirm.

## I. *Background and Procedural History*

On June 26, 2017, the Arkansas Department of Human Services (DHS) reopened a protective-services case involving Barbara and her children, ME (01/10/09), CB (07/12/14), and CR (03/12/16) due to a true finding of environmental neglect. Another report of environmental neglect, inadequate supervision, and inadequate food was made on March 9, 2018. On April 6, 2018, Grace Alexander of the Department of Children and Family Services (DCFS) made a home visit to Barbara's home and found CR unsupervised in the street, wearing only a diaper and a thin t-shirt with the temperature in the low forties. Alexander learned from her supervisor that Barbara had not been compliant with the

protective-services case plan, which had been open for about ten months. The plan included keeping her home clean and supervising her children. During the visit, Barbara refused to allow workers or police to access the home; became volatile, including screaming during the entire visit; and was unable to calm herself even when requested to do so by the police. DHS placed a seventy-two-hour hold on the children that day.

ME was interviewed the same day at the DHS office. He stated that he is scared of his mom when she acts like she did that day, adding that she "does this a lot." He had fresh bruises on his arm, and when questioned, he told the workers that Barbara had hit him "10 times with a paddle" for not listening to her. He added that Barbara also hits CR and CB. CB and CR were checked by a DCFS worker who noticed "light brown bruising on their bottoms." The worker noted that the children were "all dirty and needed a bath." CR's foster parent reported to the caseworker on April 9 that CR had, according to a physician, what appeared to be a burn on her foot.

On April 10, the circuit court granted the petition for emergency custody. A probable-cause hearing took place on April 11 wherein the court found that probable cause existed to issue the ex parte order and that it was necessary and in the children's best interests to continue in DHS custody.[1] This finding was based on the bruises on the children's bottoms, ME's report of being spanked with a paddle, and the home not being safe and appropriate. In addition, the court noted that Barbara was not in the proper mental state to care for the children, specifying she was "not mentally stable."

---

[1]Geoff Easley was listed as ME's father, Tim Rosales was listed as CR's putative father, and the father of CB was unknown.

2

The adjudication hearing was held on May 10.[2] The court found that the children were dependent–neglected as a result of neglect and parental unfitness, citing the environmental issues in the home, inadequate supervision as CR was outside alone, marks and bruises on the children indicating physical abuse, and Barbara's volatile behavior when the children were removed. The court noted that Barbara has mental–health issues based on her "scary and threatening and aggressive behavior" when DHS visited the home on April 6. The court also noted that DHS had been involved with the family since October 2010, and there are true findings against Barbara for inadequate supervision and environmental neglect with the children listed as victims. The court set a goal of reunification and ordered Barbara to cooperate with DHS; speak with the caseworkers once a month and email weekly; have a psychological evaluation and follow the recommendations; take medications as prescribed; not use illegal drugs or alcohol; submit to random drug screens; obtain and maintain stable housing and employment; and demonstrate the ability to keep the children safe from harm.

A review hearing took place on October 3 wherein the court continued the goal of reunification. The court found that Barbara had complied with most of the case plan, including having had a psychological evaluation, participating in individual counseling, maintaining stable housing and employment, and taking parenting classes. The court found that DHS made reasonable efforts to provide services to achieve the goal of reunification. At the time of the hearing, ME was in a treatment facility and DHS was ordered to explore

_____

[2]At that time the court found that Tim Rosales is CR's father and added him as a party to the case. The court also made a finding that Easley is ME's legal father.

3

therapeutic foster homes before he was discharged. CR and CB were in a placement together.

On February 27, 2019, the court held a permanency-planning hearing. The court authorized a plan to return the children to Barbara, finding that she was complying with the case plan and orders and making significant progress toward achieving reunification. The order provided that Barbara continue to demonstrate genuine, measurable, and sustainable progress toward completing the plan and following court orders. The court found that the children could not safely be placed with Barbara immediately because of ME's aggressive behavior.

A fifteen-month permanency-planning hearing took place on June 20, 2019, wherein the court changed the goal of the case to adoption with the attorney ad litem to file a termination petition. The court noted that while Barbara had complied with the court orders and case plan, she had not demonstrated that she could protect the children from harm and that she had not made measurable, sustainable, and genuine progress toward alleviating or mitigating the causes of the children's removal. The court wrote:

> The testimony today is that the mother showed [CR] a video with a man on it that reminded [CR] of Tim Rosales. This incident triggered [CR's] trauma and caused her to have night terrors. The testimony is also that the mother showed up to a counseling session with the children with visible hickies all over her body, which also triggered [CR's] past trauma due to her being physically abused. The mother also testified that she has not been in a relationship in two years, but testified that Chuck Smith gave her the hickies from a "one-night-stand." The mother's psychological evaluation, done at the outset of this case, indicates that she was unstable in her home and her choices in men were poor. The Court cannot trust that if the children were returned that the mother would keep them safe from "Hickey Man" or any other strangers. The testimony today shows that nothing has changed. The case plan and services has not made her an appropriate parent for her three children.

4

A termination petition was filed on July 11, 2019, alleging the grounds of failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2019)) and subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)).

## II. *Termination Hearing*

A termination hearing was held on September 25, 2019. Misty Winters of the Center for Youth and Families testified that she is the primary therapist for ME, who was placed there on June 30, 2019, due to aggression, mood instability, and homicidal ideation. She said that ME had come a long way in treatment and was doing well. She indicated that he was ready for release and awaiting placement. She said ME's diagnoses included disruptive mood dysregulation disorder, ADHD, other specified trauma and stress-related disorder, and borderline intellectual functioning. ME takes numerous medications for these diagnoses, including antidepressants, a mood stabilizer, and several medicines to treat symptoms of ADHD. Winters recommended ME be placed in a "therapeutic foster home or a less restrictive environment."

Winters said that ME had made a great deal of progress since school started but that he struggles with changes when things do not go the way he planned. Winters stated that ME participates in family therapy with Barbara by telephone. ME had unsupervised phone contact with Barbara until it stopped because ME acted out when he believed his mom was coming to get him.

As for the supervised contact, Winters explained that she had to redirect Barbara from talking about material things she would provide ME when he went home and instead focus on verbal praise. She was concerned that Barbara made inappropriate promises and

5

redirected Barbara to "sticking to what she knows she can do and not making empty promises" to ME. Winters said ME does not talk about his mother much and never mentioned her as a placement. He expressed concern to Winters about his sisters and wanted to visit them.

The next witness to testify was CB's therapist, Brittni Huckabay. She said that CB has been diagnosed with PTSD, and she was watching her closely to rule out reactive attachment disorder. CB also takes medications, including ones to help with her sleep and hyperactive behaviors. Therapy is directed at CB's controlling behaviors, aggression, and social and emotional skills. CB exhibits aggressive behaviors toward both children and adults, including kicking, hitting, and spitting.  Huckabay said CB had been asked to leave the daycare in the summer, and since starting kindergarten, she had five full and three half days of suspension before "being made homebound and asked not come back to the public school." Because the foster mom worked full time, DHS and the court-appointed special advocate came up with a plan to place CB at the children's shelter where she is in the trauma-informed school. At the time of the hearing, CB had been there ten days, and the shelter employees had seen only two physical outbursts, which was a slight improvement. CB had also been approved for therapeutic day treatment (TDT), but there was not an opening in her age group at that time. Huckabay also stated that Children's House would take CB if DHS approved that placement.

Huckabay testified that she had three family therapy sessions with Barbara. She said that on one occasion it was difficult to get CB from the lobby to the room, and once in the room, CB sat on Huckabay's lap and was anxious, but eventually warmed up to Barbara.

6

Huckabay said that when children say they don't want to see their mom, it is because they are afraid. She indicated that Barbara looked to her for guidance on how to handle situations such as CB's hitting and was able to listen and implement the skills she tried to teach. Huckabay eventually stopped the visits with Barbara because CB was displaying major anxiety and regression. In discussing the family therapy sessions that included CR, Huckabay said they were positive when it came to the relationship between CB and CR. CB did not express any wishes regarding her mom and did not really talk about her mom. Huckabay stated that CB mentioned ME on one occasion when CB told her that ME had hit her on the head with a hanger.

Huckabay was concerned about CB's being a sexual-abuse victim. CB told Huckabay that she was afraid that Tim (CR's father) would break into the house and kill her and that Tim was a bad man and would burn her. She explained that with CB's significant attachment issues, maintaining stability with a primary caregiver would be important in preventing regression and decreased functioning.

Christine Zini, the caseworker since July 2019, said DHS was trying to find a therapeutic foster home for ME but that his low IQ presented an impediment to placement, and there had been a recommendation that he be placed in a DDS (Division of Developmental Disabilities Services) home. Zini indicated that if ME scored higher on a second IQ test, DHS could reapply for a therapeutic foster home. She said ME had had fourteen placements since April 2018 because his behaviors were difficult to handle and caused him to be placed in inpatient treatment twice. Zini recommended that CB needs to be in a therapeutic foster home due to her behaviors.

Zini said that Barbara was in compliance at the time of the termination hearing and had done everything that was asked of her. She testified that Barbara worked at McDonald's part time and that due to a broken foot, she had been working only six to thirteen hours a week. Zini stated that Barbara did not have a steady income and did not think her income was sufficient to support three children. Zini also expressed concern about Barbara's relationship with men, specifically mentioning one man named Addison she had seen several times when she picked Barbara up at her house for counseling. Zini said the man is very affectionate with Barbara. Zini had concerns for the children's safety because some of CB's aggressive behaviors and night terrors began after Barbara had shown CB the video of a man that CB thought was the man who had sexually abused her.

Zini said that Barbara had not demonstrated the ability to protect her children, specifically noting that she had seen men in Barbara's apartment and noticed "a lot of men milling around where she lives." She did not know if it would be a safe environment for two little girls. Zini said that Barbara wants her children back, but Zini did not think Barbara could care for them because of their "emotional needs and instability."

Zini testified that DHS recommended terminating Barbara's parental rights. She testified that the children are adoptable "with the proper mental health management and support." She elaborated that CR has no issues and is adoptable right away but stated that ME and CB have "real deep, emotional issues they are working through." She thought ME and CB need to be stable before they are adoptable but that their "prognosis would be good for adoptability."

Valerie, CR and CB's foster mom since May 2018, is a special-education and high school English teacher. She testified that CR is currently doing great but had severe speech delays and was not talking at all when CR was first placed with her. CR also needed physical therapy, which she continues to receive in daycare. Valerie said that originally CR would often take food out of the garbage can and eat it when no one was looking but that she now has normal eating habits. Valerie testified that CR is doing really well in daycare, forming a nice bond with her foster family, and is acting like a normal three-year-old. She said that CR did not display aggression except in retaliation to CB's aggression. Valerie stated that CR visited with Barbara until recently when CB's visits were stopped.

Valerie testified that CB came to her home with aggression and control issues and acted out when she did not get her way, including hitting, spitting, and kicking. Valerie said that CB had been very stable in daycare for several months but that the aggression escalated in the summer, requiring her to get respite care. CB was suspended from kindergarten and placed homebound, which did not work for Valerie because she works full time. Valerie said that CB was currently in a children's shelter where she had been living for the past ten days. She said she wants to keep CB and has the training to care for her but that she is one person and works full time. Valerie said she had received a provisional acceptance for CB at Children's House, where CB could go during the day and then be home with her at night. Valerie expressed concern that if CB were put in another home, she would be "bounced" from one home to the next. Like CR, CB also had food issues, speech issues, and nightmares when she first came to Valerie's home but was doing better aside from the aggression that escalated during the summer. Valerie testified that the girls never talk about ME. Although

Valerie said she is not a potential adoptive home for the girls, she thought they were adoptable and wanted to keep them until they went to an adoptive home.

Geoff Easley, ME's father, testified that he agreed that ME should be placed out of Barbara's care and in a therapeutic foster home. He stated that Barbara has not demonstrated an ability to assess dangerous situations, indicating that she had corresponded with a sex offender in prison and had sent him a photo of her and ME. Easley testified that he was okay with his parental rights being terminated because he cannot care for ME.

Barbara was the first witness to testify when the court continued the termination hearing until October 18. She stated that she still works at McDonald's but is having a hard time because of her foot injury. Barbara said that she should get a settlement from her lawsuit in the next few weeks and was planning on buying a house and had bought a 2006 van. Barbara indicated that she has continued her counseling and was working on issues such as anxiety and depression and increasing her knowledge of what she should be looking for in prospective relationships with men. She was learning the "red flags to spot with men" and to look out for manipulators. In regard to her therapy sessions with the girls, Barbara said CR was receptive and eager to see her, but CB was not. She said that CB clung to her therapist and looked like she did not want to be there. She indicated she did not see ME in his placement at the "Baptist Home" until she got her van but that the visit went great. At the time of the hearing, she that she had not seen ME in six months but had talked to him on the phone. Barbara said she understood what the girls needed as far as dealing with all the trauma they had been through. She knew they needed structure and counseling and was

willing and able to get them counseling. She stated that she had completed parenting classes and had done everything asked of her except getting "a bigger living environment."

Barbara testified she loves her children and believes she can do "better than what everyone saw when they were taken away." She said she cannot provide ME with a safe environment "right at this moment" but can when she gets her house. She was living in her van at the time of the hearing.

Barbara testified that Addison, the man Zini saw her with, is her brother-in-law but that she was not in a relationship with him. He was just hugging her and had kissed her on the neck because he missed her cheek. Barbara acknowledged testifying at the fifteen-month hearing that she had had several one-night stands, but she is no longer doing so. She also testified that the man she spoke of in a prior hearing who had given her hickeys was not Addison. She admitted that Addison had slept with her in the van the night before the hearing but explained that he did so to take care of her dog.

Christine Zini testified again at the October hearing. She said that she had seen ME on the previous Saturday, and he was doing "very good." ME told her that he wanted more than anything to be placed in a home. Zini said that because ME scored below 70 on the IQ test, therapeutic foster home programs won't accept him, so they were looking at DDS homes. Zini stated they were also trying to get another IQ test because they believe ME is higher functioning.

Zini stated that CB is doing well and is back with Valerie and CR. She testified that she believes the children are adoptable. Zini testified that Barbara admitted to her that she

11

had been evicted and was living in her van. Zini, the ad litem, and CASA all recommended termination of Barbara's parental rights.

At the conclusion of the hearing, the circuit court terminated Barbara's parental rights on the ground of failure to remedy, finding that the children had been out of the home for eighteen months and despite meaningful efforts by DHS to rehabilitate her, Barbara did not correct the conditions that caused the removal.[3] Although the circuit court recognized that Barbara had cooperated with DHS and participated in parenting classes and counseling, it found that Barbara could not meet the children's needs and be the parent they need. The court also found that DHS had proved that the children are "very adoptable." The termination order was entered November 21, 2019, and Barbara filed a timely notice of appeal.

III. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Bunch v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 374, 523 S.W.3d 913. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Bunch*, *supra*. A heavy burden is placed on a party seeking termination because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id*. We will not reverse a

---

[3]The court also terminated the parental rights of Geoff Easley to ME and Tim Rosales to CR, but neither are a party to this appeal.

12

termination order unless the circuit court's findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

Termination of parental rights is a two-step process; it requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step, a best-interest determination, must consider the likelihood that the children will be adopted and the potential harm caused by returning custody of the children to the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i), (ii).

IV. *Discussion*

On appeal, Barbara does not challenge the statutory grounds but instead limits her argument to the best-interest determination, contending that the evidence is insufficient to prove that termination was in the children's best interest.[4] Barbara states that the case began due to concerns of inadequate supervision of her children and her inability to make progress in the protective-services case. She claims, however, that once the case began, she "had the freedom to focus on services and improving her situation." She points to the first review hearing when the circuit court found she had made progress toward alleviating the cause of removal and the permanency-planning hearing when the court found she had made

---

[4]Because Barbara does not challenge the circuit court's decision on the statutory grounds for termination, we need not address them on appeal. *Fisher v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 39, 569 S.W.3d 886.

significant progress. Although Barbara claims that the only reason she did not gain custody that day was "due to ME's aggressive behavior," this was not the only reason provided in the February 28, 2019 order. The order also provided that the "parents needed to demonstrate genuine measurable, and sustainable progress towards completing the case plan and following court orders."

At the fifteen-month review hearing in June 2019, the circuit court found that while Barbara had participated in the services according to the case plan, she had not demonstrated the ability to protect the children and keep them safe from harm. The order discussed the incident regarding Barbara's showing CB the video of a man that reminded CB of Tim Rosales, and that the incident triggered CB's trauma and caused her to have night terrors. The order also cited the testimony that Barbara showed up to a family counseling session with visible hickeys all over her body from an admitted one-night stand and that this had triggered CB's trauma of being abused. The order further noted Barbara's psychological evaluation at the beginning of the case indicating that she was unstable in her home and she made poor choices in men thus showing that the case plan and services had not made Barbara an appropriate parent.

Barbara states that at the time of the termination hearing she was no longer in a relationship and had gained the skills to avoid unhealthy relationships. She also claims that she had a job and was about to receive settlement money to buy a home. She claims that because she was on the cusp of reunifying with her children, she did not pose a harm and should have been given more time.

In considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm. *Wright v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 503, at 12, 560 S.W.3d 827, 834. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability of a permanent home. *Id.* A parent's past behavior is often a good indicator of future behavior. *Id.*

Considering the evidence overall, the potential harm is clear. The children had been in DHS custody for over eighteen months. Environmental neglect had been a concern in the protective-services case and remained a concern at the outset of the dependency-neglect case. Although she testified that she would be receiving settlement money and planned to buy a home, Barbara had been evicted from her apartment and was living in her van at the time of the termination hearing. In addition, Barbara was working only part time and admitted she did not have sufficient income to support the children at the time of the hearing.

Barbara's choices in regard to men was noted as an issue in the beginning of the case from her psychological evaluation, and this concern continued throughout the case. Zini testified that she saw a man identified as Addison at her house several times when she went to pick Barbara up and noticed how affectionate he was with her. Although Barbara claimed he was her brother-in-law and she was not in a relationship with him, there was also testimony from Zini that someone had reported to her that they saw through Facebook that Barbara was looking for housing for her and Addison. Likewise, Barbara testified at the hearing that Addison had slept in the van with her the night before the hearing. Barbara also

15

admitted to one-night stands during the case. In addition, ME's father testified that Barbara was corresponding with a man who had been in prison for a sex offense.

Although Barbara did cooperate with DHS and receive services, partial or even completion of the case plan is not determinative. *Arnold v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 300, at 13, 578 S.W.3d 329, at 337. What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for the child; mere compliance with court orders and the DHS case plan is not sufficient if the root of the parent's deficiencies is not remedied. *Id.* The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Accordingly, the circuit court did not clearly err in finding that potential harm could result if the children were returned to Barbara.

Finally, while Barbara acknowledges there was testimony that the children are adoptable, she contends there was evidence that ME and CB need additional services before they can reach permanency; thus, she should have been given additional time to secure a home and reunify with the children. She also argues that given the difficulty in finding placements for ME and CB, it is unlikely that the children will be adopted. Barbara also contends that the circuit court did not consider the sibling relationship and states that their only chance to remain a sibling group is to reunify with her.

The termination statute requires only that the court consider the likelihood that the child will be adopted. *Nichols v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 85, 542 S.W.3d 197. The circuit court is not required to find by clear and convincing evidence that the children are adoptable but merely must consider the likelihood of adoption if parental rights are terminated. *Id.* A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Id.* Here, Zini testified that the children are adoptable. Neither evidence that adoptive parents have been found nor evidence that proves the child will be adopted is required. *See Atwood v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 448, 588 S.W.3d 48.

In this case, the circuit court heard evidence of adoptability, evidence suggesting that ME should not be placed with CB and CR, and evidence that ME and CB have significant behavioral and mental-health issues and weighed the evidence in favor of termination. We cannot say that the circuit court clearly erred in finding that termination of Barbara's parental rights is in the children's best interest.

Affirmed.

MURPHY and BROWN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.